## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KEITH CHANDLER,** | * | **CIVIL ACTION NO.:** |
| PLAINTIFF | * | **DEMAND FOR JURY TRIAL** |
| | * | |
| **VERSUS** | * | **DISTRICT JUDGE:** |
| | * | |
| **3M COMPANY,** | * | **MAGISTRATE JUDGE:** |
| DEFENDANT | * | |
| | * | |
| | * | |

*****************************************************************************

## COMPLAINT AND JURY DEMAND

NOW INTO COURT, through undersigned counsel, comes Plaintiff, **KEITH CHANDLER**, who brings this Complaint seeking judgment against Defendant, 3M Company (hereafter, "3M"), for personal injuries endured while in training and/or active duty resulting from Defendant's defective and unreasonably dangerous product, the Dual-ended Combat Arms™ earplugs, version 2CAEv.2 (hereafter, "Dual-ended Combat Arms™ earplugs"). At all relevant times hereto, the Dual-ended Combat Arms™ earplugs were manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, and distributed by 3M or its predecessor, Aearo Technologies (hereafter, "Aearo").

## THE PARTIES

1. Plaintiff, Keith Chandler, is a person of the full age of majority domiciled in the Parish of St. Tammany, State of Louisiana.

2. Defendant, 3M, is a corporation organized and existing under the state of Delaware with its principal place of business in St. Paul, Minnesota.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.

4. Personal jurisdiction over Defendant 3M is proper because 3M designed, manufactured, sold, or otherwise placed the Dual-ended Combat Arms™ earplugs into the stream of commerce, including with specific transactions with and distributions to United States Military bases and military servicemembers in Louisiana. 3M knew at all relevant times that the Dual-ended Combat Arms™ earplugs would travel among and through each and every state, including Louisiana, where Plaintiff used the Dual-ended Combat Arms™ earplugs while conducting live-fire training from 2011-2013. Plaintiff has also received treatment for his hearing issues in Louisiana. As such, Plaintiff's claims arise out of Defendant's purposeful contacts with Louisiana.

5. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTUAL ALLEGATIONS**

**Overview of Dual-ended Combat Arms™ Earplugs**

6. Aearo originally created the Dual-ended Combat Arms™ earplugs. 3M acquired Aearo in 2008 by purchasing 100% of Aearo's stock. Through this acquisition, 3M also acquired Aearo's liabilities and is therefore liable for Aearo's conduct as alleged herein.

7. The Dual-ended Combat Arms™ earplugs are non-linear—or selective attenuation—earplugs that were designed to provide servicemembers with a single set of earplugs for two types of hearing attenuation depending on how the earplugs are worn. Aearo/3M represented that both

2

sides of the dual-sided earplugs provided adequate protection for servicemembers' ears when worn.



8. If worn in the "closed" or "blocked" position, with the olive or green side in the user's ear, the Dual-ended Combat Arms™ earplugs were intended to serve as traditional earplugs and block as much sound as possible.

9. If worn in the "open" or "unblocked" position, with the yellow side in the user's ear, the Dual-ended Combat Arms™ earplugs were intended to reduce loud impulse sounds—such as explosions or artillery fire—while allowing the user to hear quieter sounds.  For instance, while wearing the earplugs in the open-ended position, the user should be able to hear a commander's instructions.

**Aearo's/3M's Testing of the Dual-ended Combat Arms™ Earplugs and Knowledge of the Design Defect**

10. In or around January 2000, employees from Aearo/3M began testing the Noise Reduction Rating ("NRR") for the Dual-ended Combat Arms™ earplugs.  The NRR is a unit of measurement used to determine the effectiveness of hearing protection devices to decrease sound exposure within a given working environment.  The higher the NRR associated with a hearing protector, the greater the potential for noise reduction.

11. Aearo/3M conducted the Dual-ended Combat Arms™ earplug testing at its own laboratory rather than using an outside, independent laboratory. For the testing, Aearo/3M's employees personally selected ten (10) test subjects, some of whom were Aearo/3M employees. Aearo/3M's testing protocol consisted of testing the subject's hearing in the following three scenarios: (1) the test subject's hearing without an earplug; (2) the test subject's hearing with the open/unblocked (yellow) end of the earplug inserted; and (3) the test subject's hearing with the closed/blocked (olive/green) end of the of the earplug inserted.

12. As the testing proceeded, Aearo/3M employees monitored the test results and could stop the testing if the results did not achieve the desired NRR, a violation of ANSI S3.19-174 testing protocol. The Aero/3M employees conducted testing for eight (8) of the ten (10) test subjects as described above, with both the open and closed ends of the earplugs. Those eight (8) test subjects yielded an average NRR of 10.9 when the closed-end was inserted, which was well below the adequate and accepted NRR.

13. The Aearo/3M employees ultimately determined that the poor results for the closed-end testing were attributable to the shortness of the earplug's stem that rendered it difficult to insert the plug deeply into the subject's ear and obtain a proper fit. The Aearo/3M employees also determined that when the user inserted the closed-end into the user's ear according to the standard fitting instructions, the basal edge of the third flange of the open-end would press against the wearer's ear and fold backwards. When the inward pressure on the earplug was released, the open-end side flanges would return to their original shape and cause the earplug to loosen the seal in the ear canals, which was often imperceptible to the wearer. This defect has the same effect when either end is inserted because the earplugs are symmetrical, and in either scenario, the effect is that

the earplug may not maintain a tight seal in some users' ear canals such that dangerous sounds can bypass the plug altogether. This poses a serious risk to the user's hearing.

14. In response to the poor test results of the earplug's closed-end on the initial eight (8) test subjects, the Aearo/3M employees prematurely terminated testing of the closed-end of the earplugs and did not conduct the closed-end testing on the remaining two (2) test subjects. However, the Aearo/3M employees completed testing on all ten (10) subjects with the open-end of the plug inserted and obtained an invalid -2 NRR, a score that means the earplug would actually function as a hearing aid and amplify sound. Based on the "-2" NRR data that was obtained for the open-ended testing, it is evident that there was not a proper seal between certain of the test subjects' ear canal and the earplug, allowing noise to bypass the earplug filter and go directly into the ear canal. This is because the open-ended side of the earplug was similarly impacted by the design defects that impact the closed-end fit of the earplug. Nevertheless, Aearo/3M reported the "-2" NRR as a "0" NRR, which Aearo/3M has displayed on the packaging of the Dual-ended Combat Arms™ earplugs since the product was first launched. Indeed, Aearo/3M has falsely touted the "0" NRR as a benefit of the Dual-ended Combat Arms™ earplugs by representing that servicemembers will be able to hear fellow soldiers and enemies while still providing hearing protection.

15. In or around February 2000, Aearo/3M employees undertook retesting of the closed-end of the Dual-ended Combat Arms™ earplugs. During this retest, Aearo/3M employees used different fitting instructions and folded back the yellow flanges on the open end of the earplug (effectively elongating the too-short stem) to allow the user to insert the closed-end of the plug deeply into the user's ear to obtain a proper fit. By using this modified fitting procedure, Aearo/3M achieved a "22" NRR on the testing of the closed-end of the Dual-ended Combat Arms™ earplugs. Aearo/3M did not retest the open-end of the Dual-ended Combat Arms™ earplugs.

**3M's Misrepresentations to Secure Indefinite Quantity Contracts with the U.S. Military**

16. Despite Aearo's/3M's knowledge of the design defect associated with the Dual-ended Combat Arms™ earplugs, as described *supra* ¶¶ 13-15, Aearo/3M submitted a bid in 2003 in response to the U.S. Military's Request for Proposal (hereafter, "RFP") to be the exclusive supplier of selective attenuation earplugs to the U.S. Military under an Indefinite-Quantity Contract (hereafter, "IQC"). Aero/3M made several misrepresentations in its submission to the RFP. For example, the RFP required bidders to certify that the earplugs complied with the Salient Characteristics of Medical Procurement Item Description (hereafter, "MPID") of Solicitation NO. SP0200-06-R-4202. The relevant Salient Characteristics outlined in the MPID, which were uniform across all RFPs that Aearo/3M responded to from approximately 2003-2015, included the following:

> 2.1.1 Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.
>
> 2.2.2 The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19.
>
> 2.4 <u>Workmanship</u>. The ear plugs shall be free form all defects that detract from appearance or impair their serviceability.
>
> 2.5 <u>Instructions</u>. Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit.

Solicitation No. SP0200-06-R-4202 at 41-42.

17. 3M/Aearo responded to the Military's RFP with express certifications that it complied with the Salient Characteristics of MPID, including the characteristics cited above. Aearo/3M made these express certifications despite the fact that at the time Aearo/3M submitted its initial response for RFP in 2003, Aearo/3M knew that the Dual-ended Combat Arms™ earplugs had dangerous design defects in that they would not adequately protect users from loud sounds and did not

6

adequately warn of the design defects. Aearo/3M also knew that its test protocol did not comply with ANSI S3.19 but nevertheless certified that the testing protocol was compliant. Further, Aearo/3M certified that it provided accurate instructions when Aearo/3M knew that the design defect associated with the earplugs required modified fitting instructions to ensure a proper fit that would generate the promised NRR, as revealed by Aearo's/3M's own testing. Nevertheless, Aearo/3M failed to ever disclose or provide the modified instructions to the United States Military.

18. In addition, Aearo/3M knowingly used the flawed retest of the closed-end earplugs to represent to the U.S. Military that the earplugs possessed a "22" NRR in the closed position. Aearo/3M never disclosed the modified fitting instructions necessary to achieve the "22" NRR.

19. Aearo/3M also knowingly used the facially invalid testing of the open-ended earplugs to report to the U.S. Military that the earplugs possessed a "0" NRR in the open position and would permit servicemembers to communicate freely with their colleagues and avoid any hearing impairment.

20. In 2003, based on Aearo's/3M's misrepresentations and certifications to the U.S. Military in Aearo's/3M's response to the RFP, the U.S. Military awarded Aearo/3M the IQC to be the exclusive supplier of selective attenuation earplugs. Between 2003 to 2012, Aearo/3M repeatedly won the U.S. Military's IQCs to be the exclusive supplier of these earplugs, and for each response to the RFPs for the IQC for these earplugs, Aearo made the same misrepresentations and certifications as detailed *supra* 16-19.

**3M's False Representations with the Packaging and Marketing of the Dual-ended Combat Arms™ Earplugs**

21. Despite knowing that Aearo's/3M's testing required steps to manipulate the earplug to obtain the desired "22" NRR, Aearo's/3M's standard instructions for use of the earplugs do not instruct, and have never instructed, the user to fold back the flanges on the open end of the plug

7

before inserting the closed end of the plug into their ear. Rather, Aearo's/3M's standard instructions simply direct the user to insert the earplugs into the ear canals.

22. By failing to instruct users of the Dual-ended Combat Arms™ earplugs to fold back the flanges on the open/unblocked end of the plug before inserting the closed/blocked end of the plug into the user's ears, Aearo/3M falsely misrepresents—and overstates—the amount of hearing protection provided by the closed-end of the earplug. As such, Aearo's/3M's packaging and marketing of such earplugs with a labeled NRR of "22" misleads the user into believing the closed-end of the earplug provides much greater hearing protection when used according to the provided instructions.

23. Aearo/3M has also continued to sell the Dual-ended Combat Arms™ earplugs to the U.S. Military by representing a "0" NRR in the open position with standard fitting instructions, which is false and misleading for the reasons identified in *supra* ¶ 22. Due to the symmetrical nature of the earplugs, the defective stem issue that causes the earplug to imperceptibly loosen when the closed-end is inserted also causes the plug to loosen when the open-end is inserted. As a result, servicemembers who wear the earplug with the open-end inserted—intending to block out danger impulse noise while still being able to hear voice commands—are at serious risk of hearing impairment. When the seal between the earplug and the servicemember's ear canal is broken, dangerous impulse noise can bypass the filter on the open-end, leaving the servicemen with no protection at all.

24. In sum, prior to selling the Dual-ended Combat Arms™ earplugs to the U.S. Military, Aearo/3M was aware that it had manipulated the testing procedures and fitting instructions to obtain the desired NRRs for both ends of the earplugs. Aearo/3M continued to use these inaccurate NRRs to market the Dual-ended Combat Arms™ earplugs to the U.S. Military without disclosing

the design defect associated with the Dual-ended Combat Arms™ earplugs or providing proper instructions that would have achieved the desired NRR.

### Plaintiff Keith Chandler

25. Plaintiff, Keith Chandler, joined the United States Marine Corps (hereafter, "USMC") in 2007 and was discharged in 2013.

26. Prior to joining the USMC, Plaintiff showed no signs or symptoms of hearing loss and/or tinnitus.

27. In 2008, Plaintiff was deployed to Iraq.

28. In 2010, Plaintiff was deployed to Afghanistan.

29. From 2011-2013, after Plaintiff returned from deployment in Afghanistan, Plaintiff participated in live fire training in Louisiana as part of his duties for the Marine Corps Reserve.

30. At the time of Plaintiff's deployment and during his pre-deployment and Marine Corps Reserve training, the Dual-ended Combat Arms™ earplugs were standard issue.

31. The Dual-ended Combat Arms™ earplugs were provided to Plaintiff.

32. Plaintiff wore the Dual-ended Combat Arms™ earplugs while in training and in the field from 2007 to 2013, his tenure with the USMC.

33. Plaintiff was never instructed to fold back the flanges on the opposite side of use of the earplug.

34. In or around August 2011, Plaintiff was diagnosed with tinnitus. Plaintiff has also been diagnosed with hearing loss.

35. At the time of diagnosis, Plaintiff did not suspect, nor did Plaintiff have any reason to suspect, the cause of these injuries or that 3M's tortious conduct caused these injuries. Further, the running of any statute of limitations have been tolled by 3M's fraudulent concealment.

Through 3M's misrepresentations and omissions, 3M actively concealed from Plaintiff the risks associated with the defects in the Dual-ended Combat Arms™ earplugs. Specifically, through 3M's affirmative misrepresentations and omissions pertaining to the safety, testing, and efficacy of the Dual-ended Combat Arms™ earplugs, Plaintiff was prevented from discovering this information sooner because 3M misrepresented and continued to misrepresent the defective nature of the Dual-ended Combat Arms™ earplugs. As a result of 3M's actions, Plaintiff was unaware and could not have learned through reasonable diligence that Plaintiff had been exposed to the risks and defects alleged herein. In fact, Plaintiff did not discover that his injuries were attributable to the Dual-ended Combat Arms™ earplugs until January 2019, when he saw information about potential litigation against 3M arising out of the defective earplugs. Consequently, the discovery rule/ *contra non valentem* applies to this case and prescription has been tolled until the day that Plaintiff knew or had reason to know that his injuries were linked to the Dual-ended Combat Arms™ earplugs.

36. Additionally, pursuant to the Servicemembers Civil Relief Act, 50 U.S.C §3936, the period of Plaintiff's military service may not be included in computing any statute of limitations.

## CAUSES OF ACTION

### COUNT 1 – DESIGN DEFECT
### LSA-RS 9:2800.56

37. Plaintiff realleges and incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

38. Defendant 3M, or its predecessor, Aearo, designed, manufactured, and sold the Dual-ended Combat Arms™ earplugs. At the time the Dual-ended Combat Arms™ earplugs used by Plaintiff were sold, 3M or its predecessor, Aearo, was in the business of designing, manufacturing, selling,

and/or otherwise placing the Dual-ended Combat Arms™ earplugs, such as the ones used by Plaintiff, into the stream of commerce.

39. At the time 3M or Aearo designed, manufactured, and sold the Dual-ended Combat Arms™ earplugs, they were defective in design and unreasonably dangerous.

40. The defects associated with the Dual-ended Combat Arms™ earplugs included, but are not limited to, the stem of the dual-ended earplug being too short, rendering them difficult for users to insert the plug deeply into their ears and obtain a proper fit. The design of the Dual-ended Combat Arms™ earplug causes the earplug to loosen in the wearer's ear, imperceptibly to the wearer, and permits damaging sounds to enter the ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

41. Prior to the manufacture and sale of the Dual-ended Combat Arms™ earplugs used by Plaintiff, 3M knew about the defect associated with the Dual-ended Combat Arms™ earplugs.

42. The Dual-ended Combat Arms™ earplugs reached Plaintiff in the condition expected and intended by the Defendant.

43. Plaintiff used the Dual-ended Combat Arms™ earplugs for their intended and foreseeable purpose.

44. At the time the Dual-ended Combat Arms™ earplugs were sold and used by Plaintiff, the defective design caused the product to unexpectedly fail to function in a manner reasonably expected by an ordinary consumer.

45. At the time of the incident made the basis of the lawsuit, the Dual-ended Combat Arms™ earplugs were in the same or substantially similar condition as they were at the time they left Defendant's control and were placed in the stream of commerce. Any alterations to the Dual-ended Combat Arms™ earplugs were made by a dealer and/or agent of Defendant.

46. The defective and unreasonably dangerous condition of the Dual-ended Combat Arms™ earplugs used by Plaintiff were a direct and proximate cause of injuries to Plaintiff, including but not limited to, Plaintiff's hearing loss and tinnitus.

47. Safer alternative designs existed other than the one used by Defendant and were economically and technologically feasible and would have prevented or significantly reduced the risk of accident and/or injury in question without substantially impairing the utility of the Dual-ended Combat Arms™ earplugs. For example, Defendant could have designed the Dual-ended Combat Arms™ earplugs with a longer stem so that it would allow users to insert the plug deeper into their ear canals and obtain a proper fit.

48. This alternative design for the above-identified defects was available in the market and technologically and economically feasible at the time the Dual-ended Combat Arms™ earplugs were manufactured and would not have impaired the utility of the Dual-ended Combat Arms™ earplugs.

### COUNT 2 – INADEQUATE WARNING
### LSA-RS 9:2800.57

49. Plaintiff realleges and incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

50. The Dual-ended Combat Arms™ earplugs are defective, in part, because the design of the earplug causes them to loosen in the wearer's ear, imperceptibly to the wearer, thereby permitting damaging sounds to enter the ear canal by traveling around the outside of the earplug while the user wrongly believes the earplug is working as intended.

51. The Dual-ended Combat Arms™ earplugs, including the earplugs ultimately used by Plaintiff, were defective when they left 3M's or Aearo's control.

52. 3M failed to provide any warnings as to the risk that the Dual-ended Combat Arms™ earplugs would allow for dangerous sounds to bypass the earplug and pose a serious risk to Plaintiff's hearing.

53. In the alternative, 3M provided inadequate warnings or instructions that the Dual-ended Combat Arms™ earplugs would allow for dangerous sounds to bypass the earplug and pose a serious risk to Plaintiff's hearing.

54. As a direct and proximate result of 3M's failure to warn and/or provide an adequate warning or instructions, Plaintiff suffered injuries and damages, including but not limited to, tinnitus and hearing loss.

## COUNT 3 – BREACH OF EXPRESS WARRANTY
## LSA-RS 9:2800.58

55. Plaintiff realleges and incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

56. Through 3M's or its predecessor's, Aearo's, public statements regarding the Dual-ended Combat Arms™ earplugs, descriptions of the Dual-ended Combat Arms™ earplugs, marketing of the Dual-ended Combat Arms™ earplugs, certifications regarding the Dual-ended Combat Arms™ earplugs, and written information and packaging supplied by or provided by 3M or Aearo, Defendant expressly warranted, among other things, that the Dual-ended Combat Arms™ earplugs were safe and effective for their intended use, were designed and constructed to prevent harmful sounds from bypassing the earplugs to protect the user's hearing, and had been properly tested by Aearo/3M.

57. 3M and/or Aearo also expressly warranted that when a user wore the earplugs according to the standard instructions, the open-end provided a "0" NRR and the closed-end provided a "22" NRR.

58. The Dual-ended Combat Arms™ earplugs did not conform to the express warranties made by Defendants.

59. Defendant's express warranties induced Plaintiff to use the Dual-ended Combat Arms™ earplugs and are a proximate cause of Plaintiff's injuries, including but not limited to, hearing loss and tinnitus.

## COUNT 4
## INTENTIONAL MISREPRESENTATION

60. Plaintiff realleges and incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

61. 3M intentionally and falsely represented to Plaintiff, and the U.S. Military, that the Dual-ended Combat Arms™ earplugs had been properly tested, were free from defects, and would provide adequate protection for users' ears/hearing, as required by the guidelines used by the U.S. Military.

62. When 3M made these representations, 3M knew that it had manipulated the testing of the Dual-ended Combat Arms™ earplugs such that the standard fitting instructions did not yield the NRRs achieved in that testing.

63. 3M made these representations to Plaintiff and the U.S. Military with the intent to deceive Plaintiff and the U.S. Military and induce them to recommend, purchase, use and/or continue to use the Dual-ended Combat Arms™ earplugs.

64. Plaintiff had no reason to believe that 3M had misrepresented the safety and efficacy of the Dual-ended Combat Arms™ and reasonably believed those representations were true.

65. In reliance upon 3M's representations, Plaintiff was induced to and used the Dual-ended Combat Arms™ earplugs and sustained severe and permanent injuries, including but not limited to hearing loss and tinnitus.

## COUNT 5
## NEGLIGENT MISREPRESENTATION

66. Plaintiff realleges and incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

67. 3M falsely represented to Plaintiff—and the U.S. Military—that the Dual-ended Combat Arms™ earplugs had been properly tested, were free from defects, and would provide adequate protection for users' ears/hearing, as required by the guidelines used by the U.S. Military.

68. 3M knew or should have known that those representations were false.

69. 3M owed a duty to Plaintiff and the public in general to warrant that the Dual-ended Combat Arms™ earplugs had been properly tested and were found to be effective and safe.

70. 3M was aware that its testing procedures and fitting instructions had been manipulated and therefore breached its duty in representing to Plaintiff that the Dual-ended Combat Arms™ earplugs had been properly tested and that the standard fitting instructions would yield NRRs of "0" when Plaintiff inserted the open-end of the earplug and "22" when Plaintiff inserted the closed-end of the earplug.

71. Plaintiff had no reason to believe that 3M had misrepresented the safety and efficacy of the Dual-ended Combat Arms™ and reasonably believed those representations were true.

72. In reliance upon 3M's representations, Plaintiff was induced to and used the Dual-ended Combat Arms™ earplugs and sustained severe and permanent injuries, including but not limited to hearing loss and tinnitus.

## COUNT 6
## DELICTUAL FRAUD

73. Plaintiff realleges and incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

74. 3M intentionally and falsely represented to Plaintiff—and the U.S. Military—that the Dual-ended Combat Arms™ earplugs had been properly tested, were free from defects, and would provide adequate protection for users' ears/hearing, as required by the guidelines used by the U.S. Military. 3M's representations were false and misleading and constitute misrepresentations of fact and omissions of truth made with the intent to deceive the public and obtain an unjust advantage for themselves and to cause a loss to Plaintiff.

75. As a result of 3M's intentional misrepresentations, Plaintiff was induced to and used the Dual-ended Combat Arms™ earplugs and sustained severe and permanent injuries, including but not limited to hearing loss and tinnitus.

## COUNT 7
## NEGLIGENCE

76. Plaintiff realleges and incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

77. 3M owed a duty to Plaintiff to manufacture, produce, and sell safe and effective earplugs that had been properly tested.

78. 3M breached this duty to Plaintiff through various acts and omissions, including but not limited to the following:

   a. Failing to properly design the Dual-ended Combat Arms™ earplugs;

   b. Failing to properly manufacture the Dual-ended Combat Arms™ earplugs;

   c. Failing to adequately test the Dual-ended Combat Arms™ earplugs;

   d. Failing to adequately instruct users in using the Dual-ended Combat Arms™ earplugs;

    e. Failing to recall the Dual-ended Combat Arms™ earplugs, or alternatively, to warn consumers of a known defect with the Dual-ended Combat Arms™ earplugs;

    f. Failing to disclose post-sale information known about the dangers or defects in the Dual-ended Combat Arms™ earplugs; and

    g. Concealing known dangers associated with the Dual-ended Combat Arms™ earplugs.

79. As a result of 3M's acts omissions, Plaintiff was induced to and used the Dual-ended Combat Arms™ earplugs and sustained severe and permanent injuries, including but not limited to hearing loss and tinnitus.

## PRAYER FOR RELIEF

80. Plaintiffs request trial by jury.

81. **WHEREFORE**, Plaintiff, **KEITH CHANDLER**, prays that Defendant, **3M COMPANY** be served with a copy of this complaint, and after being duly cited to appear and answer hereto, and after the expiration of all legal delays and due proceedings are had, there be judgment in favor of Plaintiff and against Defendant as follows:

    a. Past and future pain and suffering;

    b. Past and future loss of enjoyment of life;

    c. Past and future mental anguish;

    d. Past and future loss of earning capacity;

    e. Past and future medical costs;

    f. Permanent disability and disfigurement;

    g. Past and future emotional distress;

h. All general damages in an amount to be determined according to proof at the time of trial;

i. All special damages including, but not limited to, medical expenses in an amount to be determined according to proof at the time of trial;

j. Punitive and exemplary damages in an amount to be determined according to proof at the time of trial;

k. Judicial interest from date of judicial demand until judgment is paid;

l. Cost of the suit herein incurred; and

m. For such other and further relief that the Court may deem just and proper.

Respectfully submitted,

*s/Stephen M. Huber*

STEPHEN M. HUBER, Bar No. 24463
CHARLES M. THOMAS, Bar No. 31989
LOGAN E. SCHONEKAS, Bar No. 35309
ASHLEY L.F. BARRIERE, Bar No. 38129
**HUBER THOMAS & MARCELLE, LLP**
1100 Poydras Street, Suite 2200
New Orleans, LA 70163
Telephone:	(504) 274-2500
Facsimile:	(504) 910-0838
stephen@huberthomaslaw.com
charlier@huberthomaslaw.com
logan@huberthomaslaw.com
abarriere@huberthomaslaw.com

and

ALFRED A. OLINDE, JR., Bar No. 20061
**THE OLINDE FIRM, LLC**
2 Sanctuary Boulevard, Suite 205
Mandeville, LA 70471
Telephone:	(985) 605-0262
folinde@olindefirm.com

18

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been served on all counsel of record via electronic filing, U.S. mail, facsimile and/or email on this 21st day of February, 2019.

> *s/ Stephen Huber*
> **STEPHEN M. HUBER (#24463)**